Filed 12/17/25  In re M.A. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

|  |  |
|---|---|
| In re M.A., a Person Coming Under the Juvenile Court Law. | |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.W., <br><br> Defendant and Appellant. | C103159 <br><br> (Super. Ct. No. STK-JD-DP-2024-0000113) |

Appellant A.W. (mother) appeals the juvenile court's dispositional orders removing M.A.  (Welf. & Inst. Code, § 361, subd. (c))[1] and bypassing mother for reunification services (§ 361.5, subd. (b)(6)).  She contends the court's removal order is not supported by substantial evidence and the juvenile court abused its discretion in

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

bypassing reunification services because those services were in M.A.'s best interests.  We asked the parties to file supplemental briefing addressing whether substantial evidence supported the juvenile court's section 361.5 subdivision (b)(6) determination in light of *In re T.R.* (2023) 87 Cal.App.5th 1140.  Having reviewed that briefing, we will reverse the bypass order and otherwise affirm the judgment.

## BACKGROUND

### *The 2018 Case and Associated Criminal Conviction*

I.H. was born to mother at 28 weeks and admitted to the neonatal intensive care unit (NICU).  In December 2018, when I.H. was approximately seven months old, mother brought him to the emergency room with a fever, cough, and chest pain.  X-rays revealed broken ribs in various stages of healing.  I.H. also had multiple crescent-shaped, deep abrasions on both flanks, abdomen, and below the breastbone.  Before mother was told about the broken ribs, she suggested I.H.'s injuries were caused by a puppy, which they no longer had, and denied that he had been exposed to trauma.  After learning of the fractures, mother gave inconsistent reasons for the injuries, such as the puppy, an issue with a car seat, and cosleeping with I.H. at her feet.  She was unable to provide a date that he was injured.  According to a child abuse expert, these causes were inconsistent with the nature of I.H.'s injuries, which indicated intentional physical abuse.  The expert opined the rib fractures were consistent with squeezing or compression of the chest and the crescent abrasions were likely fingernail imprints caused by that squeezing.  I.H.'s injuries were typically associated with shaking, had occurred over time, and were likely to reoccur and/or escalate without intervention.  I.H. was taken into protective custody, and a skeletal survey revealed a fracture of the right femur and possible fracture of the left tibia requiring casting of the legs.

The Sacramento County Juvenile Court declared I.H. a dependent in February 2019.  Mother was offered reunification services through an exception to bypass;

however, those services were soon terminated due to mother's nonparticipation. Mother's parental rights to I.H. were terminated in November 2019. I.H. was adopted by his caregiver, maternal great-aunt L.H., and dependency jurisdiction terminated in 2020.

In October 2019, mother was convicted of felony child endangerment (Pen. Code, § 273a, subd. (a)) for which she received a grant of five years' probation including that she serve 300 days in jail. A five-year protective order issued prohibiting mother from contacting I.H. The underlying criminal documents are not part of the record on appeal, and thus, the record does not reflect the theory of liability for mother's conviction.

***The Initiation of the Present Case***

M.A. was born in April 2024 at 36 weeks and placed in the NICU due to respiratory issues. Mother tested positive for marijuana and admitted to weekly marijuana use throughout her pregnancy. She intended to breastfeed M.A. and promised to stop smoking marijuana. M.A.'s initial drug test was negative. When asked about the 2018 case, mother explained that I.H. was injured from rolling on him during cosleeping and during a car accident where he was not in his car seat. She did not take I.H. to the doctor because he stopped crying after the accident and did not appear injured. This accident had been her boyfriend R.Z.'s explanation for I.H.'s injuries back in 2018. Mother explained she failed to participate in previous services because she was homeless, ashamed, and had lost familial support.

On April 19, 2024, the San Joaquin County Human Services Agency (Agency) filed the section 300 petition at issue in this case alleging M.A. had suffered or was at substantial risk of suffering serious physical harm or illness. The petition alleged five sets of facts supporting this allegation, four of which pertained to mother. These included mother's substance abuse, as well as detailed allegations concerning I.H.'s injuries from the 2018 case and that mother's parental rights to I.H. had been terminated.

In April 2024, the juvenile court temporarily detained M.A. over mother's objection with services to be provided pending the jurisdiction and disposition hearings.

3

The court further approved mother's assessment for drug court, granted mother supervised visitation, and approved out-of-county placement with the maternal great-aunt L.H.

***The Agency's May 2024 Jurisdiction/Disposition Report***

The Agency's May 2024 jurisdiction/disposition report recommended mother be bypassed for reunification services pursuant to section 361.5, subdivision (b)(6). I.A. (father) had not established paternity and thus was not entitled to services. During her pregnancy with M.A., mother smoked cigarettes three times daily, as well as marijuana. She admitted consuming methamphetamine four times daily to escape the loss of I.H. but reported father helped her rehabilitate. Nevertheless, mother told the Agency the last time she was sober was when she was 15 years old.

Mother's use of marijuana throughout her pregnancy, plan to breastfeed, and prior dependency case involving severe physical abuse for which mother failed to reunify showed M.A. was at great risk of suffering harm if returned to mother. M.A.'s half-sibling I.H. had been subjected to severe physical abuse involving multiple broken ribs and a broken leg that would not normally occur without neglect or abuse. Mother, who was the sole caregiver, continued to deny and deflect responsibility, showing a lack of insight and accountability.

Mother consistently visited M.A. and was attentive and interactive with her. The Agency submitted referrals for mother to participate in parenting classes, individual counseling, substance abuse treatment, and drug court. Mother was admitted to residential substance abuse treatment with New Directions in April 2024 and participated in a child and family team meeting in May 2024. Nonetheless, the Agency recommended the juvenile court bypass reunification services pursuant to section 361.5, subdivision (b)(6). Mother's behavior showed a pattern of dishonesty and failure to take

4

accountability for the removal of her children.[2]  Further, she had a longstanding history of substance abuse and continued use of marijuana throughout her pregnancy with M.A. Thus, the report concluded, "mother [had] failed to make reasonable efforts to address and treat" the problems that led to the removal of I.H. as well as the problem leading to the removal of M.A.

On May 9, 2024, the juvenile court found good cause to continue the combined jurisdiction and disposition hearing.  The Agency's June 2024 supplemental report recommended reunification services be provided to father, who had achieved presumed father status.  Mother was visiting M.A. at her residential treatment program for three hours on Mondays.  Genetic testing later confirmed father as M.A.'s biological father, and father waived his right to challenge jurisdiction and disposition.  Nonetheless, the court held off on making jurisdictional or dispositional findings given that mother was contesting them.

In November 2024, the juvenile court granted mother's request for a temporary restraining order against father based upon father allegedly stalking, harassing, destroying property, and hurting the maternal grandmother, J.M. by hitting her in the head with a wrench.

***The Hearing on Jurisdiction/Disposition and Restraining Order***

The combined contested hearing on jurisdiction/disposition and mother's request for a restraining order against father began on January 22, 2025.

---

[2]  As to the current danger to M.A., the report stated:  "The agency is concerned with the mother's previous severe physical abuse dependency case on her then 7 month old infant that ended in the minor being adopted out due to the mother's failure to follow through with reunification services.  The mother has, to date not provided a viable explanation for the severity of the injuries on her first child.  The father does not currently have the ability to be protective of this minor at this time, thus leaving the minor with no parent to keep the minor safe."

### A. The Restraining Order

Mother testified as to her restraining order request that she did not witness the altercation that occurred between J.M and father. Mother and J.M. were at the home mother shared with father. At the time, mother was still in a relationship with father and was pregnant with his child. Mother was inside the home when father allegedly hit J.M. Mother saw that J.M.'s back windshield was broken. J.M. declined to go to the hospital, and mother did not see any injuries. Mother no longer feared father, wanted father to be at the anticipated birth of their son in May, and planned on coparenting with him. In light of this testimony, the juvenile court dissolved the restraining order because the court did not have jurisdiction to protect only J.M.

### B. The Agency's Evidence

The Agency submitted two previous jurisdiction/disposition reports and a compilation of documents concerning the 2018 case into evidence. Included with the 2018 case documents was a December 30, 2018, abuse assessment performed by child abuse expert Dr. Julia Nicole Magana. I.H.'s injuries included, on the right side, 11 rib fractures of varying severity and stages of healing, and on the left side, 13 rib fractures of varying severity and stages of healing. Dr. Magana opined the rib fractures were from compression squeezing, associated with abuse, and unlikely to stop and could even escalate without intervention. I.H. also had fractures to his right femur and left tibia requiring casting. Mother's boyfriend R.Z. reported I.H.'s injuries may have been caused by an accident where I.H. was unrestrained in the backseat and the boyfriend slammed on the breaks at 50 miles per hour and I.H. flew into the center console. Dr. Magana refuted that a sudden stop could have caused I.H.'s rib or leg injuries. J.M. reported mother's seven-year-old brother told her that R.Z. squeezed and shook I.H. when he was crying. A followup interview with mother's brother failed to confirm this.

Also included was a February 2019 addendum report from the 2018 case acknowledging that mother could be bypassed for services pursuant to section 361.5,

subdivision (b)(5) and (6), but recommending reunification services were in I.H.'s best interests and would be likely to prevent re-abuse under exceptions found in section 361.5, subdivision (c)(2) and (3). Because mother failed to visit I.H. or stay in contact with the Agency, the Agency later recommended it was not in I.H.'s best interests that mother receive reunification services.

### C. Mother Submits on Jurisdiction and Contests Disposition

Mother waived her right to a trial on jurisdiction, and the juvenile court determined it had jurisdiction over M.A.[3] Proceeding to the contested disposition, mother submitted exhibits showing her regular visitation with M.A. and graduation from drug treatment. Mother also took the stand, testifying to skills she learned from completing parenting education, therapy, and a drug rehabilitation program. She was also still participating in drug court. As to the 2018 case, mother had been using methamphetamine and marijuana and believed her drug use impacted her ability to parent. She admitted her drug use "might" have caused her to neglect I.H.'s "needs" or impacted her "being able to see that he had injuries." She also admitted failing to take accountability and had recently learned information she avoided through her drug use. Mother stopped using hard drugs two years prior and had not used marijuana in nine months. She visited twice weekly with M.A. for five and a half hours total. If offered services, mother would continue to learn and benefit from them.

On cross-examination, mother admitted that I.H. had broken ribs and leg fractures caused by twisting and pulling. She had been using methamphetamine multiple times a day prior to the 2018 case. She and her boyfriend R.Z. cared for I.H., and mother only left I.H. unsupervised with R.Z. if she was showering, using the bathroom, or shopping. Mother denied causing I.H.'s injuries or knowing that they had occurred. Her

---

[3]     Mother does not challenge the jurisdictional findings here.

7

explanations were all things that had really happened even though they had not caused his injuries. Mother still did not think R.Z. had injured I.H. Mother had a lengthy history of using methamphetamine and marijuana but had successfully completed residential and outpatient drug treatment programs through drug court.

Mother's testimony continued on February 6, 2025. Mother had learned to recognize the signs of an abusive relationship and had recently reviewed her brother's statements about I.H. She believed her brother about R.Z. squeezing I.H., though she had never actually seen that happen, and felt guilty for not recognizing I.H. was hurt and getting him treatment sooner. While she had testified before that she did not think R.Z. had hurt I.H., she changed her testimony to say that it had to have been him. Mother admitted she was still a work in progress and could benefit from additional services, which she pledged to participate in. Mother never violated the five-year protective order preventing her from seeing I.H. Her current pregnancy was high risk, but she had been seeing a specialist and attending all her appointments. Mother already had a crib, changing table, bouncer, walker, and clothes for M.A. so that she could care for her if she was to reunify.

The Agency argued the juvenile court should bypass mother pursuant to section 361.5, subdivision (b)(6). While acknowledging mother's rehabilitative efforts, it was not until her testimony that she had taken responsibility for what had happened to I.H. while in her care and had only done so with extreme reluctance. Mother's previous consistent denials despite the receipt of extensive services concerned the Agency and led to doubts about how I.H. had really been injured and whether mother could have been responsible. That, in turn, concerned the Agency for M.A.'s safety and as a result, the Agency argued, there was not clear and convincing evidence that it was in M.A.'s best interests for mother to receive reunification services. M.A.'s counsel concurred with the Agency, highlighting mother's lack of insight as well as that I.H.'s injuries were extreme and occurred over time. Mother argued in favor of applying the exception to bypass

8

services given her growth and commitment to continuing to change not only to benefit M.A., but also mother's unborn child. Mother had done everything asked of her and through the filing for the temporary restraining order had demonstrated her willingness to address any safety concern.

Having considered all the evidence and argument, the juvenile court ruled "that reunification services will not be ordered for the mother. That she has not shown by clear and convincing evidence that it would be in the best interest of the child to provide services. And the (b)(6)—361.5(b)(6) applies. [¶] . . . [¶] Court finds by clear and convincing evidence that the half-sibling was adjudicated as a dependant [*sic*] of this court as a result of the infliction of severe physical harm. And it would not benefit the child to pursue reunification services. That reunification services would not benefit the child.· No services are to be provided pursuant to Welfare and Institutions Code Section 361.5(b)(6)." The court further adopted the proposed findings and orders of the Agency's reports dated May 6, 2024, and June 7, 2024, including that M.A. be removed from mother's custody. Mother timely appealed.

## DISCUSSION

### A. The Removal Order

Mother contends the trial court's removal order is unsupported by substantial evidence. Although she did not challenge M.A.'s removal in the juvenile court, we acknowledge that failure does not forfeit a sufficiency of the evidence challenge on appeal. (*In re R.V.* (2012) 208 Cal.App.4th 837, 848.)

Under section 361, subdivision (c)(1), a minor may only be removed from the home if the child protective agency establishes by clear and convincing evidence that (1) "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home" and (2) "there are no reasonable means by which the minor's physical health can be protected

9

without removing the minor from the minor's parent's . . . physical custody." Jurisdictional findings other than severe physical abuse of a child under the age of five do not result in a presumption in favor of removal. (*In re Zoe H.* (2024) 104 Cal.App.5th 58, 72.) Instead, a juvenile court considers the current risk to the child given the parent's past conduct and present circumstances. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) It is not necessary to show prior harm to the child; rather, the statute focuses on averting that harm. (*Ibid.*)

We review the juvenile court's findings for substantial evidence keeping in mind the clear and convincing evidence standard. (*In re Zoe H., supra*, 104 Cal.App.5th at p. 71.) This has been described as " 'whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' " (*In re M.V.* (2022) 78 Cal.App.5th 944, 960.) In conducting this review, we consider "the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.) " ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " 'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' " (*In re Yolanda. L.* (2017) 7 Cal.App.5th 987, 992.)

Mother contends the Agency failed to present substantial evidence that there was a " 'substantial danger' " to M.A. if returned to mother or that any danger could not be safely mitigated by reasonable means. We disagree.

The Agency presented detailed, disturbing evidence concerning the injuries to M.A.'s half sibling I.H. in 2018. I.H. was born at 28 weeks and spent some period of time in the NICU. When I.H. was almost seven months old, mother brought him to the

emergency room with a fever, cough, and chest pain. X-rays performed upon admission, as well as a later skeletal survey, revealed 24 rib and two leg fractures in various stages of healing (some acute, some old). These injuries were consistent with nonaccidental trauma. Dr. Magana opined the rib fractures were from compression squeezing, associated with abuse, and unlikely to stop and could even escalate without intervention. The leg fractures were likely from pulling and twisting and thus associated with abuse. Neither mother's nor her boyfriend's explanations were consistent with I.H.'s injuries. Although mother was initially offered reunification services pursuant to an exception to bypass (§ 361.5, subd. (c)(2), (3)) those services were terminated following mother's failure to visit I.H. or stay in contact with the Agency.

Moreover, mother was convicted in October 2019 of felony child endangerment (Pen. Code, § 273a, subd. (a)) and a court issued a five-year protective order prohibiting mother from contacting I.H. While the appellate record does not contain further detail concerning this conviction and protective order, their existence supports an inference that mother was a threat to I.H.'s safety.

The evidence presented at the January and February 2025 contested disposition hearings, including mother's consistent belief that I.H.'s injuries while in mother's care occurred nonaccidentally, further supports that mother presented an ongoing risk to M.A.'s safety. At the January 2025 hearing, mother testified that she and R.Z. were I.H.'s only caregivers and that she only left I.H. alone with R.Z. if she was showering, using the bathroom, or shopping. She denied causing I.H.'s injuries or knowing that they had occurred. Nonetheless, mother maintained that R.Z. had not injured I.H. Specifically, mother was asked, "So if you didn't hurt him, who do you think hurt him?" Mother responded, "I don't know. When I sat in jail for the first time, I had to think real hard whether or not I thought boyfriend at the time did that. *But I don't believe that he did that. And I didn't see any signs of him doing that.* And he had his own children around

11

us, and I thought he was kind of a good dad to his own children. So I just don't know for sure." (Italics added.)

When mother continued her testimony the next month, she explained that she had recently reviewed previous statements made by her seven-year old brother about R.Z. squeezing I.H. and that she believed her brother. Mother denied ever witnessing that happen and felt guilty for not recognizing I.H. was hurt and getting him treatment sooner. While she had previously testified that she did not think R.Z. had hurt I.H., she reluctantly changed her testimony, stating, "It had to be the partner that I was with at the time."

As highlighted by the Agency and M.A.'s counsel, mother's extreme reluctance to blame her former boyfriend R.Z. for I.H.'s injuries—over five years after they occurred and following her serving a jail term associated with those injuries—speaks to mother's inability to accept any accountability for what happened to I.H. And given the nature of those injuries, even a low risk of reoccurrence supported an order removing M.A. to keep her safe. (See, e.g., *In re D.B.* (2018) 26 Cal.App.5th 320, 331-332 [" 'Some risks may be substantial even if they carry a low probability because of the magnitude of the harm is potentially great' "]; *id.* at p. 333 ["corporal punishment presents a far greater risk of injury—and serious injury—to a toddler than it does to an older teenager"].) Moreover, given the extensive documentation of I.H.'s numerous broken bones that occurred over time, we conclude the record establishes the possibility that the endangering conduct could reoccur, thus distinguishing mother's authorities. (See, e.g., *In re Yolanda L., supra*, 7 Cal.App.5th at p. 993 [future danger cannot be inferred from a single previous act]; *In re Hailey T.* (2012) 212 Cal.App.4th 139, 142-143, 147-148 [only evidence of danger posed by parents was disputed expert testimony that 4-year-old Hailey T. could not have caused her infant brother's injuries, which had occurred on a single day]; *In re David M.* (2005) 134 Cal.App.4th 822, 831 & fn. 3 [record lacked sufficient detail to

establish risk posed by neglect occurring four years earlier], abrogated on other grounds in *In re R.T.* (2017) 3 Cal.5th 622, 628-629.)

Accordingly, although we acknowledge that mother had successfully completed residential and outpatient drug treatment programs through drug court to combat her lengthy history of using methamphetamine and marijuana, serious questions raised by the severity of I.H.'s injuries incurred over a period of time and mother's continued denial of accountability for the injuries, as well as M.A.'s tender age, supported the juvenile court's decision that there were no reasonable means other than removal to protect M.A. from a substantial risk of physical harm. (See, e.g., *In re Cole C., supra*, 174 Cal.App.4th at pp. 904, 917-918 [removal of 7 month old supported by the father's failure to acknowledge "the inappropriate nature of his parenting techniques and disciplinary methods"]; *In re V.L.* (2020) 54 Cal.App.5th 147, 156 [parent's denial increases the risk of reoccurrence].) In light of this conclusion, we do not consider mother's remaining argument that her substance abuse problem no longer supported removal.

B.    *The Bypass Order*

Mother challenges the juvenile court's order denying her reunification services under section 361.5, subdivision (b)(6) because reunification was in M.A.'s best interests in accordance with the exception found in section 361.5, subdivision (c). Mother also faults the juvenile court's failure to specify on the record the factual findings necessary to its determination that severe physical harm had been inflicted in accordance with section 361, subdivision (b)(6) and that reunification services would not benefit M.A. as required by section 361.5, subdivision (k). We asked the parties to file supplemental briefing addressing whether substantial evidence supported the juvenile court's bypass order in light of *In re T.R., supra*, 87 Cal.App.5th 1140. Having reviewed that briefing, we now conclude substantial evidence does not support the juvenile court's bypass order.

13

Section 361.5, subdivision (b)(6), in pertinent part, applies where "the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of . . . the infliction of severe physical harm to the child, a sibling, or a half sibling by a parent or guardian, as defined in this subdivision, and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." (§ 361.5, subd. (b)(6)(A).) Thus, subdivision (b)(6) requires a child protective agency to establish both the infliction of severe physical harm[4] *and* that the child will not benefit from reunification services. (*In re T.R., supra*, 87 Cal.App.5th at pp. 1148-1149.) The latter requirement distinguishes subdivision (b)(6) from other bypass provisions. (*In re T.R.*, at p. 1149.)

Section 361.5 also provides guidance about the determination of these issues. As relevant to this case, "A finding of the infliction of severe physical harm, for the purposes of . . . subdivision [(b)(6)], may be based on, but is not limited to, deliberate and serious injury inflicted to or on . . . the body of a . . . half sibling of the child by an act or omission of the parent or guardian." (§ 361.5, subd. (b)(6)(C).) Further, the statute requires the juvenile court to consider certain enumerated factors as well "any information it deems relevant" in determining whether a child would benefit from reunification services under subdivision (b)(6).[5] (§ 361.5, subd. (i).) The juvenile court

---

[4] We acknowledge section 361.5, subdivision (b)(6) may also apply in instances of severe sexual abuse not applicable here. (§ 361.5, subd. (b)(6).)

[5] The enumerated factors are: "(1) The specific act or omission comprising the severe sexual abuse or the severe physical harm inflicted on the child or the child's sibling or half sibling. [¶] (2) The circumstances under which the abuse or harm was inflicted on the child or the child's sibling or half sibling. [¶] (3) The severity of the emotional trauma suffered by the child or the child's sibling or half sibling. [¶] (4) Any history of abuse of other children by the offending parent or guardian. [¶] (5) The likelihood that the child may be safely returned to the care of the offending parent or guardian within 12 months with no continuing supervision. [¶] (6) Whether or not the child desires to be reunified with the offending parent or guardian." (§ 361.5, subd. (i).)

must "read into the record the basis for a finding of . . . the infliction of severe physical harm under paragraph (6) of subdivision (b), and shall also specify the factual findings used to determine that the provision of reunification services to the offending parent or guardian would not benefit the child." (§ 361.5, subd. (k).)

We find *In re T.R., supra*, 87 Cal.App.5th 1140 instructive. That case considered the juvenile court's noncompliance with statutory requirements for making a bypass decision, as well as the substantiality of the evidence supporting the court's decision. (*Id.* at pp. 1143, 1150.) *In re T.R.* began by highlighting the importance of family preservation that led the Legislature to apply a presumption in favor of reunification services and a heightened standard of proof. (*Id.* at p. 1148.) Given this presumption, reunification services are bypassed only if the child protective agency establishes by clear and convincing evidence one of the 17 enumerated exceptions. (*Ibid.*, citing § 361.5, subd. (b).) If such a showing is made, then bypass of reunification services will occur unless the parent establishes by clear and convincing evidence that reunification services would be in the child's best interests. (*Ibid.*, citing §361.5, subd. (c).)

Like the court in *In re T.R.*, we lament any noncompliance with these statutory procedures given the importance of reunification to dependency, the heightened clear and convincing evidence standard, and the fact that section 361.5 subdivision (k) specifically requires the juvenile court to articulate the facts supporting its section 361.5, subdivision (b)(6) findings. (*In re T.R., supra*, 87 Cal.App.5th at p. 1150.) While acknowledging the juvenile court in our case did better than the court in *In re T.R.,* it still fell short of compliance. (*Ibid.*) Here, the juvenile court found "by clear and convincing evidence that the half-sibling was adjudicated as a dependent of this court as a result of the infliction of severe physical harm. And it would not benefit the child to pursue reunification services. That reunification services would not benefit the child. No services are to be provided pursuant to Welfare and Institutions Code section 361.5 (b)(6)." However, the juvenile court failed to detail the factual basis for the conclusions

15

about severe physical harm inflicted upon M.A.'s half sibling, as well as the conclusion M.A. would not benefit from mother's reunification services as required. (§ 361.5, subs. (b)(6), (k).) Like the court in *In re T.R.*, we will not decide whether this failure would be sufficient to warrant reversal. (*In re T.R.*, at p. 1150.) Rather, we will consider the sufficiency of the evidence in the record supporting these determinations.

In *In re T.R.*, there was no evidence that the corporal punishment by the offending parent had resulted in either "serious harm or injury" to the minors. (*In re T.R., supra*, 87 Cal.App.5th at p. 1150.) As such, corporal punishment could not supply the evidentiary basis for the juvenile court's finding under section 361.5, subdivision (b)(6)(C). (*In re T.R.,* at p. 1150.) Further, the court refused to use the offending parent's previous infliction of first degree burns on a sibling of the minors when that sibling was two years old (and several years prior to the case) to find the requisite severe physical injury required of section 361.5, subdivision (b)(6). (*Id.* at p. 1151.) The court reasoned, "section 361.5, subdivision (b)(6) applies to cases of *current* physical abuse." (*Ibid.*) Thus, although "some bypass provisions [could] be triggered by events from previous dependencies, section 361.5, subdivision (b)(6) applies to the infliction of severe physical harm that led to the current dependency." (*Ibid.*) As examples, the court highlighted "section 361.5, subdivision (b)(3), [which] applies in cases where 'the child or a sibling of the child has been *previously* adjudicated a dependent,' and section 361.5, subdivision (b)(10)(A), [which] applies in cases where the parent failed to reunify with the child's sibling or half sibling after they '*had been* removed' from the parent's custody." (*Ibid.*) In contrast, "section 361.5, subdivision (b)(6)(A) applies in cases where the child or their sibling '*has* been' declared a dependent as a result of the infliction of severe physical harm. (Italics added.)" (*Ibid.*)

Moreover, because a single instance of serious physical harm occurring years before the minors were born could not alone support dependency jurisdiction, *In re T.R.* concluded, "it cannot support the requisite finding of severe physical harm." (*In re T.R.,*

16

*supra*, 87 Cal.App.5th at p. 1151.)  Finally, the court concluded that unlike jurisdiction and removal, which may be based upon "a *risk* of injury," "the grounds for bypass under section 361.5, subdivision (b)(6) . . . must be based on an *actual* injury."  (*Ibid*.)

Nor did *In re T.R.* find substantial evidence supporting an implied finding that the minors would not benefit from reunification services.  (*In re T.R., supra*, 87 Cal.App.5th at p. 1152.)  The offending parent had shown a willingness to change and nothing in the record suggested the minors would not want to be reunified with the offending parent.  (*Ibid*.)  Because the child protective agency bore the burden of establishing the minors would not benefit from reunification services, reversal was necessary.  (*Id*. at pp. 1152-1153.)

Here, like in *In re T.R.*, the record lacks support for the required section 361.5, subdivision (b)(6) findings.  The only evidence of severe physical injury came from the prior dependency action concerning I.H.  (*In re T.R., supra*, 87 Cal.App.5th at pp. 1144, 1151.)  However, unlike *In re T.R.*, in this instance I.H.'s injuries occurred over time and were expressly alleged as a basis for jurisdiction.[6]  (*In re T. R.*, at p. 1144.)

However, even if we were to determine that previous injuries to I.H. constituted the resulting severe physical harm that section 361.5, subdivision (b)(6) demands, we would still find that the Agency did not establish by clear and convincing evidence that M.A. would not benefit from mother receiving reunification services.  (§ 361.5, subd. (b)(6).)  Here, mother had actively participated in all reunification services for over 10 months from the start of the case, including successful completion of residential and outpatient drug treatment programs and had made great progress in completing nearly all of those services by the time of the court's ruling, and had consistently, lovingly, and

---

[6]    In contrast, it appears the information concerning the sibling's severe burns from a single instance of being placed in a scalding bath were included in the detention report, but not the petition.  (*In re T.R., supra*, 87 Cal.App.5th at pp. 1144-1145.)

appropriately visited M.A.  Mother had no other history of child abuse, had pledged to continue engaging in services, and had already obtained a crib, changing table, and other essentials that M.A. would need if they reunified.  Thus, it appeared that M.A. could have been safely returned to her within 12 months of reunification services.  (§ 361.5, subd. (i)(4)-(5).)  Accordingly, we conclude substantial evidence does not support the juvenile court's finding that M.A. would not benefit from mother receiving reunification services.  Accordingly, the juvenile court's order bypassing reunification services must be reversed.  Given this conclusion, we do not reach mother's remaining challenge to the juvenile court's section 361.5, subdivision (c) determination.

## DISPOSITION

We reverse the juvenile court's order bypassing mother's reunification services pursuant to section 361.5, subdivision (b)(6) and remand for further proceedings consistent with this opinion including the provision of reunification services.  The judgment is otherwise affirmed.


/s/
_____
EARL, P. J.

We concur:


/s/
_____
KRAUSE, J.


/s/
_____
WISEMAN, J.[*]

_____

[*]     Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.